Good morning, Your Honor. Kevin Harris, appearing on behalf of the plaintiff appellant in this matter. I would request to reserve five minutes of my time. At the outset, I'd like to address the supplemental authority that was provided by the defendants in this case, which is the Hartage v. CBS case. Defendants cannot find any solace in that case, as not only is it materially distinguishable from the incident case, it also provides an illustration as to why in hostile work environment cases that the entire totality of the circumstances should always be considered in determining whether a hostile environment exists. Would you tell me exactly which statutes your client is relying on? My client is relying on the Fair Employment and Housing Act in relationship to the discrimination clauses of action, also Title VII. He's also relying upon the DOI regulations in relationship to the requirements of the investigation of the fraud aspects of the case. Those are the primary statutes that he's relying upon, Your Honor. He does rely on the ADA. Oh, yeah, the ADA and the ADEA, those are also listed. Well, I don't find anything in the complaint that would suggest that. Well, I'm pretty sure the complaint. I've got the complaint right here, all umpteen pages of it. Well, under FIA, there's handicapped discrimination that was pled. I'm not necessarily. Did you point to a place in that voluminous complaint where I could find solace? Solace in the totality of the circumstances? Your Honor, I don't necessarily think that. If you look at the heart of this case, what it really comes down to is that True was a whistleblower. He complained about things that related to his harassment of both discrimination and sexual conduct. I think that even if the main heart of this case is that he was a whistleblower that felt that he was trying to do something that was treated inappropriately in regards to several matters, and that in his dispute resolutions and throughout the entire period of time that he started making complaints, he related all of those incidents in. Well, let's go to the retaliation. Yes, Your Honor. What evidence is there that the employer knew about his complaints to these people you say were government employees? Oh, well, I think in particular in relationship to that, they had knowledge of the fact that he had contact with the people at the Department of Insurance and in relationship to Ed Faith at NICIB, and you can discern that from the fact that True in his original dispute resolution complaint indicates that there's violations of that particular statute in relation. What evidence is there that the employer knew what he told them, not that they met with him? Oh, well, the employer knew, well, it's circumstantial evidence, Your Honor. The employer had a copy of the statute that True was saying was being violated in his dispute resolution thing. They knew that he was going to these conferences like the NICIF conference, and I believe there was another conference that he was scheduled to go to, that he had once again made complaints to, close in time to a point that Sharon Sullivan prevented him from being able to go to the two conferences where he was going to meet with DOI agents and the NICB individual. And he complained, that was in November of 1999, there was the situation where she berates him over the telephone and tells him that he can't go to this conference that he wants to go to where he's going to meet with, they're going to discuss it with the fraud investigators and the like. So they have knowledge that he's having contact with people, they're preventing him from having contact with them. And additionally, True, throughout the whole process, keeps telling them in his dispute resolutions and everything else, I mean, which reports to Owens in November of 1999, and continually, if you look at every single one of the ones that he makes, he's telling them there's these violations, that you're not doing things correctly, and yet he's having contact, and they know that he has contact on an ongoing basis with these individuals from the department. So it's reasonable for them to suspect that he has gone to the department. I don't necessarily think that that's totally a determinative factor, whether or not they knew or not. Because if you look at the Tammany cause of action, which is the wrongful termination and violation of public policy for whistleblowing, it does not require that there be knowledge of a contact with the government. But that's a separate claim. That's a separate claim. But they interrelate because of the fact that they both are aspects of making complaints of whistleblowing in regards to legal activities. And I think the distinction, you know, it's easier to find it under the Tammany cause of action than it is under the 1102.5 cause of action. Under 1102.5 of the cause of action, you have to rely primarily upon the circumstantial evidence that relates. But you can prove a case through circumstantial evidence. There's no requirement that I prove that they directly had knowledge of him having contact with the DOI. I mean, and there's also ‑‑ that they raise is, in that case, the supervisor, the individual, Mr. Hartage, went to his human resources person and told him, I don't want you to do anything. And the court said, well, because he said, I don't want you to do anything, I don't want you to take any actions, then he is not entitled to claim that he was a whistleblower who sought the relief from his employer. Here is the complete opposite thing has happened. True has consistently been going to his employer complaining. As early as April of 1999, he complains to the human resources people. He sends a dispute resolution in June of 1999. After each one of the checkpoints, he's making more complaints to them and indicating, in fact, the very last thing that he does, if you look, in July, even in July of 2000, in his resignation letter, he indicates that he believes that they're trying to find fault with his work product in a move that will make him leave his employment or fire him. And before that, in response to his PDS, which he sends off in June of 2000, June 6th of 2000, he indicates that the review was fraudulent and due to harassment towards him for reporting the illegal activity. And they knew about that. Because what's clear about that factor, they knew about him saying that there were these complaints of retaliation, was that they looked at that themselves, his PDS response. They sent a letter out, and they had a letter that they drafted in July 21st, 2000, which is at 1136 of the record, AAR. That was a letter from Allstate to True asking him to identify the criminal activities and the files where the criminal activities were located that they never sent to him because he was terminated, because he was constructively terminated and had resigned. And that's at 1134 through 1135. And they had these e-mails that show that in those circumstances, they had knowledge that he was making these complaints. And what it comes down to is True, because of all the things that were happening to him, and because of his medical condition, the depression that he was suffering from, which they knew of because he had to file a claim of workers' compensation claim, Diane Sheldon Orton testified that she, in fact, knew he had a workers' compensation claim pending for the depression and harassment. So they knew that he was susceptible to being attacked. And it's the same as in the Colores case. If you look in the apparel... And what is it different they did with him? There was a yelling incident with the one person that interviewed him and yelled at him, I think. Yeah, there was an incident in April of 1999 with True where they had a meeting to go over his checkpoint. And during the course of that, she was yelling and berating at him. And there was, in fact, in the investigation that Allstate... And did Allstate say to the confirmed male that this was done to him? Isn't that your discrimination case? The discrimination claim that he's making is that there had been a past pattern of practice. If you also look at the way that Mr. Ruzic was treated... He was the one that gave the declaration, I think it was, or affidavit... Well, I think it was five years... Yeah, I thought five years, but I didn't want to say that. I think it was five years prior to the date of the declaration. That's what my memory is. It was sometime before Mr. True, but it was the same actor. It was Sharon Sullivan. Once again, it was Sharon Sullivan who was yelling and berating and singling out the male employee. One of their biggest problems that they have throughout the whole situation is, True and Ruzic were demanding that they do their duty that the state of California has legislated them to do. And that duty is simply to investigate fraud cases, to try to keep down the cost to the public. So unlike a situation like, for example, where there's somebody who's whistleblowing about a company's embezzling themselves, this is a situation where you have somebody complaining about a public right. And that public right that the public is being sought to, a public policy issue, which is to protect the ratepayers, and the amount of money that the ratepayers have to pay out because you're trying to uncover fraud. Police departments do not have the resources to go out on insurance fraud cases and nail all the people that are committing insurance fraud. So the legislature relies upon the insurance companies to do that through the legislation which we cite in the regulations codes, which gives the responsibility to the insurance companies. And here, when True's making these complaints, he's saying, look, you're not doing your job. And what's more disturbing is they're going to say that True's performance wasn't any good because there were complaints by the people that he was investigating. Well, if you're going to investigate somebody for fraud, you bet they're going to complain about you. And if you're going to be as good as Mr. True was and save all $1.7 million in the motor track frauds, and you're going after the hell's angels, you're going to get some more complaints. And the one thing that you can look at that Mr. True points out in his documentation that shows his performance is beyond that of anybody else, is if you look at how he, in his declaration, he describes all the inadequacies that were done in the file review by Mr. Kennedy in regards to the hell's angels situation. And then you have his, the two individuals that are responsible for setting up the SIU in Northern California, Mr. Rocha and Mr. Ruzic, saying this guy's performance is beyond that of the other adjusters, that this is somebody who does what the legislature has told them to do and go out and get fraud. And he is being persecuted because of the fact that he's not doing the numbers game. And here they reward people who just pass files through and they get adjusters of the year when they do inadequate performance. Here the public is, there's a disservice to the public that is being done by Allstate. And that is what Mr. True complained about. And that is what he is, what the primary aspect of this case is. Counsel, on your constructive discharge claim, the company didn't want him to leave. And it seemed when he moved over to this new unit that the things that were asked of him didn't seem unreasonable or excessive. I'm having a little problem with your constructive discharge. Well, Your Honor, I think I can summarize it this way, the constructive discharge. The incident that occurs in April of 1999, that's like somebody walked up to Mr. True with a two-by-four and nailed him. No, let's be specific exactly what was that communication and what was being asked of him. In the April of 1999 situation, Mr. True indicated to them that Ms. Sullivan said, I want you to send me an e-mail, instead of putting it on the diary system, to indicate if you have any questions in relationship to the manner in which, for a request to do investigations and the like. The DOI requirements are that it has to be on the diary system so that there's a record that shows that a thorough investigation is being taken place. This was something that Mr. True objected to and said, well, if you want me to do that, then I need that direction in writing. And when he requested for it to be in writing, which would establish that it's a direct order in violation of the Department of Insurance regulations, she began to yell at him. And that's when the things escalated and she started to come out of control. And there were witnesses there, like Tina Scott, who also observed, you know, there was this attitude towards Mr. True in that room where she came out. Maybe I'm asking about the wrong date. He's moved over to the other unit. And so what was that that caused the? Well, I think there were several things that happened when he went over to CNA. The first thing that happened when he went over to CNA was the fact that in April of 2000, he gets an e-mail from Diane Ortman accusing him of violating Department of Insurance regulations. Did they accuse him of anything? Didn't they ask a question or want some information? No, the information that was supplied was to his supervisor, Mr. Milborn, here's the Department of Insurance claim that True did something wrong, basically is the gist of the e-mail, and this is for your records because you now supervise True. Whereas that wasn't actually the case. What had occurred was that management had not timely followed through in relationship to the guidelines and making reports to the Department of Insurance. It wasn't True's fault at all that the thing had occurred, but they attributed it to True. Then the second thing that occurs is that you have Ballew makes the request that he provide a PDS response to his 1999 evaluation in I think June 6th of 2000. True then provides a response, and in that response he indicates, that there have been illegal acts occurring, and that's, and that I think is at 1133, there's a copy of that, AER 1133, there's a copy of the PDS response that he sends. And then within eight days of that, Milborn gives him a coaching session that indicates that there's a file that he hasn't adequately investigated. Whereas later on, after he resigns, Milborn comes back and says, oh, no, that file was, should have been denied, and doesn't change it based on any of the information that True had provided, because it was still based upon the diary information. So there's an eight-day period in between the action of what True considers to be a retaliatory action and his making the report to the PDS, and he provided a copy of the PDS to Milborn, the response to the PDS where he indicates that there's illegal acts. Then you also have Milborn, who specifically tells True in a meeting, and that's particularly. Do you want me to really, I should respond to this question, though, Your Honor, and I would rather, but I think that the big, the big thing there is when Milborn contacts True, he explains that, I'm sorry, that the Milborn. I'm sorry, I lost my train of thought. Why don't you reserve the rest of your time. Okay, I'll reserve it and then I'll address it. I'm going to stand on the record here in a purely figurative sense. Good morning, Your Honors. Linda Insko of Latham & Watkins, representing Allstate Insurance Company and CNA. May it please the Court, we believe that the fundamental question that's presented by this case in particular is whether or not an employer truly has any prerogative whatsoever to manage and coach its employees with respect to their performance, or can an employee such as Mr. True, who disagrees with his manager's evaluation of his performance, quit and sue? Can he say, you rated me a meets expectation, but I think I should have gotten a gold star, and because of that, I have causes of action against you for discrimination, for retaliation, for constructive wrongful discharge? Because that's what this case is all about. The evidence really boils down to this. Mr. True had four managers over the last four years of his employment. The first one was Sharon Sullivan, the woman who he accuses of discriminating against and retaliating against him. During the first year to two years that they worked together, he and Ms. Sullivan got along fine. He had no problems with her. He thought she was maybe a little bit hard in terms of her evaluation of his performance, but otherwise they had no conflicts whatsoever. Then Mr. True is transferred to work for another supervisor, Kelly Gonzalez. Ms. Gonzalez, in September of 1998, tells Mr. True during a checkpoint meeting that she believes that he needs to improve his customer relations. She's heard him saying in the office that the customers are liars, cheats, and thieves. He has more complaints from customers than his peers in this Fraud Investigative Unit. So it's not a matter of Allstate expecting people in its Fraud Investigation Unit to have zero complaints from customers. Of course there are going to be complaints, but Allstate does track complaints and establish that Mr. True had more complaints than his peers. He was being asked simply to bring himself in alignment with his peers. Mr. True took great umbrage to those comments about his performance, those comments that were made in September of 1998. The very first time Mr. True ever complains about anything is April 1, 1999. He submits to Allstate a request for resolution with respect to his 1998 performance evaluation, which said that Mr. True met expectations. Mr. True thought he should have been rated exceeds expectations. Yes, he was 98. Was that when he uncovered the fraud or was instrumental in that? It was actually 1997 and leading into 1998. That's correct, Your Honor. I kind of got the impression from reading the briefs and all that it was because of the work he had done there that he thought that his April 1 of 1999 evaluation should have been higher than it was. That's correct. He debated. He thought his evaluation should have been higher. But if that's the kind of claim that the district courts and the appellate courts in this country are going to be asked to resolve whether or not an employee was correctly evaluated as meets expectations or should have been evaluated as exceeds expectations, then we are truly on the road to the courts becoming the super personnel review boards that many, many courts have said we don't want to be. And that's where Mr. True's original complaint comes in. He also complains at the same time that he believes that Allstate is not adequately investigating fraud. Then he has a meeting a few days later with Sharon Sullivan in which he and Ms. Sullivan have a disagreement, which the record does reflect was a pretty spirited disagreement about her expectations of him with respect to what he was going to put in the claims diary and what he was not, how he was handling his pending files, and the amount of money that Mr. True was spending to uncover fraud, which she said, again, was excessive and out of pattern with his peers. Mr. True disagreed with those critiques of his performance. And the very next day he went out on a very extended disability leave. He was out for four and a half months. When he came back, he met with his Allstate managers. In the meantime, he had filed another complaint about Ms. Sullivan's treatment of him during that April meeting. He met with Ms. Sullivan's manager and with Human Resources. He did not request that he be assigned a different supervisor. That's in the record. Although he criticized Allstate for not assigning a different supervisor, he did not request that. He and Ms. Sullivan worked together for another three or four months, and then he was assigned yet another supervisor. Now, at the end of 1999, Allstate has a quarterly checkpoint process. And at the end of 1999, there was another checkpoint review which Ms. Sullivan gave since she had been his supervisor for the entire year. And in that checkpoint, she rated him as needs improvement overall. Now, the checkpoint, however, is not a final performance review under the Allstate system. The checkpoint is an interim review that may inform the final review, but is not anything that ever affects the employee's compensation, his eligibility for promotion or transfer, or any of the other material terms and conditions of his employment. So at the end of 1999, he gets the checkpoint rating, and he also has a meeting with Ms. Sullivan's supervisor, Diane Ortman. And Ms. Ortman gives him an additional three months to do three specific things to bring his rating up to a needs expectations. Now, these what was being demanded, if you will, of Mr. True, was the same thing being demanded of other people in the Allstate organization? Yes. There were certain expectations, including that adjusters in the SIU would take certain continuing education courses that Allstate offers to them. There was a customer service course, which in his checkpoint reviews during the prior year, 1999, Mr. True had been asked to take. He hadn't taken it. Either that or the record of his having taken it had been lost. I think there was some debate about that in the record. And so he was asked to take that course. I believe there were two other courses which Allstate requires its adjusters take that he was asked to take. He was asked to bring his customer complaints in line with those of the other adjusters in the unit. And he was also asked, I believe, to bring his matrix compliance in line with unit standards. Matrix compliance. The adjusters at Allstate are asked to follow a checklist, which is called the matrix, in performing fraud investigations. And part of the reason why the matrix was developed is because in doing those investigations, Allstate needs to be sure that not only is it complying with DOI regulations with respect to investigation of fraud, but it's being fair to its customers. And it's conducting those investigations in an appropriate way that doesn't expose the company to claims for bad faith insurance denials or inappropriate conduct in their investigations. So he was being asked to bring himself up to approximately 90 percent compliance with the matrix, which was the unit standard. Mr. True did those things. And in April of 2000, he was given a performance rating that rated him meets improvements or, excuse me, meets expectations. Mr. True again was offended by the fact that he was rated a meets expectations. He thought he should have been rated an exceeds expectations. He thought he should have gone from a checkpoint indicating that he needed improvement to a final review for the year indicating that he exceeded expectations. So he again indicated to his supervisors that he wished to file a response to the review. And that was what prompted the request from Alyssa Ballew in approximately May or June to Mr. True asking, are you going to respond? There was a deadline to respond in order for it to become part of his performance review record, and she wanted him not to miss that deadline. So that was what prompted the first, I think, incident that Mr. True indicated caused him to feel that he was being constructively discharged in the summer of 2000. Now, I don't think that we can find any case, even in a retaliation context, where the courts have rather expansively interpreted adverse action, where this type of performance record, a record of evaluation of the plaintiff, is considered to be sufficient to sustain causes of action against the employer for discrimination or for injury. I think that the district court's very well-reasoned and very scholarly opinion below ought to be affirmed on all counts. First of all, with respect to retaliation, the district court was absolutely right that there simply is no triable evidence. There's no material evidence for a trier of fact to consider that all State knew that Mr. True was blowing the whistle with respect to its fraud investigation practices. Mr. True argues that that can be inferred. It can be inferred from the fact that he was telling his employer that they were out of compliance with DOI regulations. I think that's too much of a stretch to suggest that necessarily because an employee says, I think that we need to do more to investigate fraud, the employer would therefore conclude that the employee has gone to the DOI and made a formal complaint. It's too much to expect that the employer would therefore have knowledge of complaints to the DOI. Have you since learned that he really did complain about the fraud investigations to governmental people? Well, if you want to call generalized griping over dinner at a trade conference complaining, yes, he did have a conversation apparently with a DOI investigator. There is evidence of that in the record. A fellow with whom he had worked on a number of cases, including the Motor Tech Fraud Scam by the name of Earl Dorr. Now, Mr. Dorr's job at the Department of Insurance was not to investigate insurance companies' compliance with DOI regulations. You disagree that these were governmental people anyway, don't you? Mr. Dorr is an employee of the Department of Insurance. Mr. Dorr, according to Mr. True, did receive from Mr. True information over dinner at a trade conference with respect to Mr. True's allegations that Allstate was not in compliance with DOI regulations with respect to the investigation of fraud. And when did that take place with respect to the claim constructive termination? That would have been October of 1999, the trade conference about which Mr. True and Sharon Sullivan had a debate whether or not he was going to attend, which is another reason that Mr. True ascribes that Allstate would have had knowledge, that he had made or was planning to make complaints to the Department of Investigation. In fact, if you look at the record, what the record shows is that Sharon Sullivan told Mr. True that he should not go to the trade conference if, as a result of his attendance at it, he was going to have to hire three investigators to manage his files in the interim. And that is the context of the debate, not I don't want you to go because who knows what you're going to say to the DOI people who will be there, but you shouldn't go if you can't get your work done. Now, with respect to the complaints, that's the only evidence in the record, and it's been at best, that Mr. True in fact ever complained to a governmental entity, was the generalized griping over dinner to someone whose responsibility it was not to monitor compliance by insurance companies with DOI regulations and no follow-up by Mr. True with Mr. Doar ever. And what's the evidence as to the employer learning that True talked to Doar? Pardon me, Your Honor? What's the evidence as to the employer, Allstate, learning that True talked to Doar at the dinner? None whatsoever. In fact, the evidence in the record, Your Honor, is that each and every one of Mr. True's supervisors who was deposed testified flat out that they had no knowledge whatsoever that Mr. True had made complaints to the Department of Insurance about Allstate's fraud investigation practices. What about this Mr. Zuzich or whoever it was, five years before? Had he worked for Sullivan? Was Sullivan one of his supervisors? He was. Sullivan was Mr. Zuzich's supervisor in the period, I believe he says in his period, there was one at least alleged shouting match with Ms. Sullivan, as a result of which Mr. Zuzich concludes that she treated men differently than she treated women. Now, that's five years before Mr. True experienced any problems with Sharon Sullivan. It's at least three years before Mr. True worked for the first time with And it's also has nothing whatsoever to do with perceived discrimination against Mr. True. I should point out. Nothing to do with what? Perceived discrimination against Mr. True. Discrimination. By Ms. Sullivan, correct. Character evidence, as we call it. Exactly. Character evidence, at best. Or as the district court put it, at best, circumstantial evidence of discrimination, but so distant in time that it doesn't have the weight that would be required in order to raise a material evidence of fact for trial. I mean, frankly, we raised many objections to the declaration of Mr. Zuzich, which is rife, as much as Mr. True's evidence is below, with conclusion and argument and very thin on factual discussion. And all of those objections are preserved for appeal. The district court only found necessary to rule on three of those objections, to which Mr. True has now, in his reply brief for the first time, raised as an assignment of error. And by raising it for the first time in his reply brief, those objections to the district court's rulings are waived, we would submit. Unless the Court has any other questions, I'm happy to waive the rest of my argument time and turn it over to Mr. Harris. Thank you. Your Honor. Oh, pardon me. You have a minute and 37 seconds. Your Honor, she does raise one issue that relates to the issue of the hearsay. I did in my opening brief indicate that I believe that True had an objective reasoned belief that he was subject to a hostile work environment based on his age, sex, and handicap, and he was aware of observed people of like status receiving similar treatment. You know, when I'm talking about the hearsay, the only thing I'm saying is it can be hearsay, but you can use hearsay to look at state of mind. And the state of mind in these two cases, for constructive discharge and for hostile work environment, is did he have a subjective state of mind that he had no choice but to quit, or that did he have a subjective state of mind that there was a hostile environment? And then the objective standard under Nichols is would a reasonable person of a like situation have the state of mind that he should quit? And when you're dealing with this analysis of both the state and federal courts, it's appropriate to consider some hearsay evidence to the extent that it goes to state of mind, only to that issue. And it can be limited to that issue, and I believe that that's relevant as to that aspect. And in relationship to the actions that were taken against him, I don't think they're all one little act. I think you have to look at them from April 19th all the way through to see a pattern. It's like he gets hit with a bat and then constantly tapped until he's not at the point that he can no longer take it and he leaves. And that's what a reasonable person would do under the circumstances that true was. And Akers is a case that specifically in regards to adverse actions, if you take a look at Akers, it says that you can have a letter of reprimand that goes towards the performance evaluation as long as the performance evaluation can affect your, the amount of money that you receive, it's an adverse action. And here, these checkpoints and these coaching memorandums were things that they could consider in making a determination as to whether or not they would give a pay raise. And under those circumstances, all of those acts would be adverse actions, including the last one, which is the coaching memorandum given to him by Milborn. And then the e-mail that he, well, he gets that e-mail at the very end which accuses him, which he sees as accusing him of theft, which is an issue of fact. Does that e-mail accuse him of theft or not? Thank you very much. All right. Thank you, Your Honor. I appreciate your time.
judges: B. Fletcher, Thompson, Bea